## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**RFA Brands, LLC., et al.**

       **Plaintiffs,**

**v.**

**John Joseph Beauvais, et al.**

       **Defendants.**

Case No. 2:13-cv-14615-GER-MAR
Hon. Gerald E. Rosen
Magistrate Judge Michael J. Hluchaniuk

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, FALSE ADVERTISING AND DAMAGES



Plaintiffs FKA Distributing Co., LLC, House of Marley, LLC and RFA Brands, LLC (collectively, "Plaintiffs") hereby move for summary judgment pursuant to Fed. R. Civ. P. 56(a) of trademark infringement, unfair competition, false advertising and damages by Defendant Joseph Beauvais (hereinafter, "Defendant" or "Beauvais").

Defendant has not disputed that he sold products on Amazon using Plaintiffs' trademarks, HoMedics, myCharge, HDMX Audio, The Sharper Image and House of Marley. A presumption of likelihood of confusion applies and, the multi-factor test of likelihood of confusion would resoundingly be satisfied for the direct use of Plaintiffs' trademarks in selling the goods. The primary issue is whether Defendant can meet his burden of proving that he is entitled to a first sale defense.

There is no genuine issue of fact that the first sale defense is inapplicable. Defendant argues that he bought two storage units at an auction in May 2013 and he "discovered" the products in the units a "few weeks" after he won the bid. If anything, however, this reveals a lack of knowledge concerning the history of the products. Defendant's purported auction purchase of these products is conclusively false. Foremost among the evidence of falsity, many of the goods sold had not even been manufactured and/or had entered U.S. soil before the purported auction. Instead, all evidence points to the fact that the products were stolen merchandise from the warehouse returns section. Furthermore, the first sale defense is vitiated where the products are sold with inaccurate information and/or material differences exist with genuine goods. Here, Defendant inaccurately sold the goods as "new" when the goods were not new but warehouse returns and had otherwise been



1

opened.  Defendant has failed to prove a legitimate first purchase that could warrant the sale of the goods as new on the Amazon website.

Nor do any material issues of fact exist on the unfair competition and false advertising claims.  Defendant misrepresented the products as new when the products were not new but instead returns.  Even if Defendant had "found" the goods in the two storage units, he could not know and admitted not knowing if the purportedly "found" products were new.  He also testified before Magistrate Judge Randon to having opened the packages himself.  Finally, disgorgement of profit damages is an appropriate remedy in this case pursuant to the Lanham Act.

The parties met and conferred in accord with L.R. 7.1(a), in which counsel for Plaintiffs asked Defendant for concurrence to the present motion but Defendant indicated that the motion would be opposed.

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

Dated:  May 30, 2014

  /s/   Linda D. Mettes
Mark A. Cantor (P32661)
Linda D. Mettes (P69182)
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Tel:  (248) 358-4400 / Fax:  (248) 358-3351
Email:  mcantor@brookskushman.com
      lmettes@brookskushman.com

*Attorneys for Plaintiffs*



## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**RFA Brands, LLC., et al.**

       **Plaintiffs,**

**v.**

**John Joseph Beauvais, et al.**

       **Defendants.**

Case No. 2:13-cv-14615-GER-MAR
Hon. Gerald E. Rosen
Magistrate Judge Michael J. Hluchaniuk

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF TRADEMARK INFRINGEMENT, FALSE ADVERTISING, UNFAIR COMPETITION AND DAMAGES



# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

CONCISE STATEMENT OF QUESTIONS PRESENTED ...................................v

I.     INTRODUCTION ...................................................................1

II.    SUMMARY OF THE ARGUMENT .....................................................2

III.   APPLICABLE LAW .................................................................4

IV.   UNDISPUTED FACTS ..............................................................6

V.    ARGUMENT ......................................................................14

    A.   A First Sale Defense Has Not and Cannot be Proven by Defendant ...........................................................15

        1.   Defendant Cannot Prove an Actual First Sale ..................... 15

        2.   Misrepresentations Preclude a First Sale Defense .................. 17

        3.   Material Differences Preclude a First Sale Defense ............... 17

    B.   Likelihood of Confusion is Presumed and Met by the *Frisch* Test ...........................................................18

        1.   Material Differences Warrant Likelihood of Confusion Presumption ................................................. 19

        2.   Defendant's Intent Warrants Likelihood of Confusion Presumption ................................................. 19

        3.   The *Frisch* Test Establishes Likelihood of Confusion ............ 20

    C.   Summary Judgment of Unfair Competition is Merited .......................22

    D.   Summary Judgment of False Advertising is Merited ..........................22

    E.   Disgorgement of Profit Damages ............................................23

VI.   CONCLUSION ...................................................................25



# TABLE OF AUTHORITIES

## Cases

*Adolph Coors Co. v. A. Genderson & Sons, Inc.*,
  486 F. Supp. 131 (D. Colo. 1980) ...................................................5

*Am. Farm Bureau Fed'n v. Alabama Farmers Fed'n*,
  935 F. Supp. 1533 (M.D. Ala. 1996) ...........................................20

*AmBrit, Inc. v. Kraft, Inc.*,
  812 F.2d 1531 (11th Cir. 1986) ...................................................20

*American Council of Certified Podiatric Physicians and Surgeons
  v. American Bd. of Podiatric Surgery, Inc.*,
  185 F.3d 606 (6th Cir.1999) .........................................................23

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................4

*Babbit Electronics, Inc. v. Dynascan Corp.*,
  828 F. Supp. 944 (S.D. Fla. 1993) ................................................5

*Bel Canto Design, Ltd. v. MSS Hifi, Inc.*,
  837 F. Supp. 2d 208 (S.D. N.Y. 2011) ........................................19

*Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*,
  562 F.3d 1067 (10th Cir. 2009) ...................................................18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................4

*Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*,
  78 F.3d 1111 (6th Cir. 1996) .......................................................22

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*,
  109 F.3d 275 (6th Cir.1997) ........................................................21

*Dell, Inc. v. This Old Store, Inc.*,
  2007 WL 2903845 (S.D. Tex. 2007) ......................................3, 17



*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
    806 F.2d 392 (2d Cir.1986) ..................................................................1

*Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*,
    911 F. Supp. 2d 616 (E.D. Tenn. 2012) ............................................. 5, 15, 19

*General Motors Corp. v. Autovation Technologies, Inc.*,
    317 F.Supp.2d 756 (E.D.Mich. 2004) ................................................ 19, 22

*Green v. Elec. Vacuum Cleaner Co.*,
    132 F.2d 312 (6th Cir. 1942) ..................................................................5, 16

*Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*,
    425 F.3d 708 (9th Cir.2005) ..................................................................5

*J. C. Penney Co. v. Charbeth's Little General Store*,
    185 U.S.P.Q. 254 (E.D.N.Y.1975) ..................................................................18

*LaQuinta Corp. v. Heartland Properties, LLC*,
    603 F.3d 327 (6th Cir.2010) ..................................................................23

*Laukus v. Rio Brands, Inc.*,
    391 F. App'x 416 (6th Cir. 2010) ..................................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..................................................................4

*Microban Products Co. v. API Indus., Inc.*,
    2014 WL 1856471 (S.D.N.Y. 2014) ..................................................................5

*Perkins School for the Blind v. Maxi–Aids, Inc.*,
    274 F.Supp.2d 319 (E.D.N.Y.2003) ..................................................................18

*Ryan v. Volpone Stamp Co., Inc.*,
    107 F. Supp. 2d 369 (S.D.N.Y. 2000) ..................................................................15

*Shell Oil Co. v. Commercial Petroleum, Inc.*,
    928 F.2d 104 (4th Cir. 1991) ..................................................................18



*Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*,
    982 F.2d 633 (1st Cir.1992) ................................................................. 18, 19

*Too, Inc. v. TJX Companies, Inc.*,
    229 F. Supp. 2d 825 (S.D. Ohio 2002)............................................................16

*Wynn Oil Co. v. American Service Corp.*,
    943 F.2d 595 (6th Cir. 1991) ............................................................................18

## Statutes

15 U.S.C. § 1117 ................................................................................... 23, 25
15 U.S.C. § 1125 .........................................................................................23

## Rules

Fed. R. Civ. P. 56.......................................................................................1, 4



iv

## CONCISE STATEMENT OF QUESTIONS PRESENTED

1.     Whether Plaintiffs are entitled to summary judgment that Defendant committed trademark infringement and unfair competition by selling goods on Amazon using Plaintiffs' trademarks without a first sale defense when i) Defendant cannot prove a first authorized sale; ii) Defendant's contention of his purchase from an auction is demonstrably false and iii) even if purchased with storage units, the sale of the goods by Defendant does not meet the conditions required for application of the first sale defense involving full accurate disclosure and no material difference from genuine goods.

2.     Whether Plaintiffs are entitled to summary judgment that Defendant committed false advertising by misrepresenting the nature of the goods on Amazon as "new" products when i) the products were not new; ii) he had no knowledge of the actual state of the goods even under his claim of having "found" the goods in two auctioned storage units; and iii) he testified that he had opened the packages.

3.     Whether Plaintiffs are entitled to summary judgment of damages in the form of disgorgement of profits as statutorily authorized by the Lanham Act.

**Plaintiffs Answer each issue: YES**



v

## I.    INTRODUCTION

"One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."  *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir.1986).  The appearance on the Amazon website of returned product that had been stolen from Plaintiffs' warehouse being sold at cut-rate prices was a matter of significant distress to Plaintiffs.

The cut-rate prices devalued important product lines and damaged Plaintiffs' relationship with Amazon and others.  Moreover, a sample purchased product bore the signs of having been a returned product, which fact has now been further confirmed from the Amazon sales records and an inspection of the remaining inventory.  The sale of returned product slated for destruction posed a significant risk of poor quality merchandise in worn packaging reaching consumers, contravening Plaintiffs' established quality control procedures.  To protect the brand and ensure the highest quality of the product, Plaintiffs do not refurbish and sell returned goods but instead only provide brand new, quality-controlled products to its authorized U.S. distributors and retailers.  (Ex. 1, Harthun Decl. ¶ 22, 26.)  Thus, though Defendant's sales totaled less than $30,000, the continuous stream of a large variety of returned product on the largest Internet retailer beginning in August 2013 was a serious threat to Plaintiffs' brands that necessitated the present suit.



## II.    SUMMARY OF THE ARGUMENT

Summary judgment is warranted that Plaintiffs trademarks, HoMedics, myCharge, HDMX Audio, The Sharper Image or House of Marley, have been infringed by Defendant Beauvais' sale of goods on Amazon without any first sale rights to do so.  The products at issue have never been legitimately purchased in a first sale.  And, Defendant improperly misrepresented the product as "new" when the goods were not new but instead returned product stolen from the warehouse. The goods also had otherwise been opened by Defendant as he testified in Court.

Defendant admitted selling products using Plaintiffs' trademarks but claimed the defense of first sale, alleging that he obtained the goods through a one-time purchase of two auctioned storage units in May 2013.  Defendant has the burden on this defense and he has not presented any evidence establishing a connection between those two storage lockers and the sale months later of goods bearing Plaintiff's trademarks.  While the claim was dubious on its face considering the product selling variations over time and the credible testimony of the prior owner of the storage unit, the Amazon sales records proved that the goods could not have emanated from a one-time auction when at least nine SKU's being sold had not been manufactured and imported prior to the time that the prior owner had been locked out of the units in March 2013.  Records also showed that Defendant "sold out" of an item in October and yet began selling additional units in November.



2

Even so, the auction story cannot support a "first sale" defense, which is limited and only will apply if i) a first sale authorized by the trademark holder is proven by a defendant, ii) the product is sold with accurate information, and iii) the product quality and the quality control mechanisms of the manufacturer are not impeded.  Mysterious found goods of an unknown origin and unknown nature does not prove a first sale enabling Defendant to sell product as "new."  To benefit from the "first sale" defense, the reseller must "tell the truth, and the whole truth, and ... tell it plainly."  *Dell, Inc. v. This Old Store, Inc.*, 2007 WL 2903845 at * 4 (S.D. Tex. 2007).  The "first sale" defense is similarly inapplicable if the resales are materially different from original product.  *Id.*  Material differences include a deviation from quality control standards or a diminished or absent warranty.

Defendant cannot prove a first sale and a first sale defense is not viable for the selling of returned product.  Returned product is fundamentally different from the production product provided by Plaintiffs to consumers and returned product would not be eligible for warranty coverage.  In addition, even apart from the absence of veracity of Defendant's claim that he properly owns the product, Defendant has no defense to selling returned products as new which is false advertising and further constitutes unfair competition.  Finally, a disgorgement of profits as statutorily authorized by the Lanham Act is warranted by the undisputed facts.



### III.   APPLICABLE LAW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).  The court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Once the movant presents evidence to meet its burden to show no genuine issue of material fact, the nonmoving party must come forward with some significant probative evidence to support its claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).   The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249–50 (1986). The non-moving party must show more than a "metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.

The only infringement liability issues at hand is whether Defendant can assert a first sale defense and whether Defendant's use of the marks created a likelihood of confusion.   Ownership of the trademarks is not in dispute.   Defendant's use of Plaintiffs' trademarks in selling products is not in dispute.

The Sixth Circuit has long held that the burden to establish a first sale defense is **not met by merely asserting "that the articles are legitimate and, without disclosing their source, were purchased from those who bought from**



**the plaintiff**." *Green v. Elec. Vacuum Cleaner Co.*, 132 F.2d 312, 314 (6th Cir. 1942); *see also Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616, 626-27 (E.D. Tenn. 2012). First, to avoid infringement, the defendant must prove an authorized sale by the trademark owner. *Microban Products Co. v. API Indus., Inc.*, 2014 WL 1856471 at * 9 (S.D.N.Y. 2014) (granting summary judgment). Second, even where such authorized sale is proven, "[i]t is well settled that the right of a purchaser to resale a product is limited." *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131, 135 (D. Colo. 1980). Many cases have held that the resale of goods may constitute infringement when differences exist in quality control, the products themselves or warranties. *See, e.g., Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir.2005); *Babbit Electronics, Inc. v. Dynascan Corp.*, 828 F. Supp. 944, 956-57 (S.D. Fla. 1993) *aff'd*, 38 F.3d 1161 (11th Cir. 1994).

> The Sixth Circuit evaluates the following factors for likelihood of confusion:
>
> (1) the strength of the plaintiff's mark, (2) the relatedness of the goods offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels, (6) the probable degree of purchaser care, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line. *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir.1982).

> These factors may not need to be evaluated where a presumption of likelihood of confusion is applicable. *See Ford*, 911 F.Supp.2d at 622 (applying presumption).



## IV.   UNDISPUTED FACTS

1.   Key facts relevant to this Motion are provided under oath in the Declaration of Dawn Harthun (Ex. 1) and the previously submitted Affidavits of Roman S. Ferber (Ex. 2) and Andrew M. Bartnowak (Ex. 3).

2.   Plaintiffs own numerous registered trademarks for their brands, including HoMedics, myCharge, HDMX Audio, The Sharper Image and House of Marley.  (Ex. 2, ¶ 10 and Ex. A thereto.)

3.   Plaintiffs' products have become popular because they utilize innovative technology and subject their products and services to a rigorous set of quality and customer service standards.  (Ex. 1, Harthun Decl. ¶ 6.)

4.   Plaintiffs have invested millions of dollars marketing and advertising the brands worldwide and in a variety of media, including television, radio, newspapers, magazines, and the Internet.  (Ex. 1, Harthun Decl. ¶ 7-8.)

5.   Defendant offered a wide variety and significant quantity of Plaintiffs' products (including numerous SKU's of each product) identified as new and/or unused and advertised under their trademarked brand names and labels, including Homedics, MyCharge, HMDX Audio, The Sharper Image, and House of Marley.  In the product offerings on Amazon, these trademarks were featured in product literature and product images that were provided to customers considering purchase of the products.  (Ex. 1, Harthun Decl. ¶ 13.)



6

6.     The wide scope of Plaintiffs' products being offered for sale on the "Joe Roof Storefront" has never been available from any single authorized distributor or retailer of Plaintiffs' products.   Plaintiffs' Commerce Township warehouse is the only location where all the products are available in one location. (Ex. 1, Harthun Decl. ¶ 14.)

7.     Both the SKU's and quantities of offered Plaintiffs' products changed significantly over time and appeared to be frequently replenished which was indicative of a continuous supply.  (Ex. 1, Harthun Decl. ¶ 15; Ex. 4, Dep. Ex. 7.)

8.     Defendant Beauvais was selling a large number of Plaintiffs' products as new products on Amazon for substantially less than possible if obtained legitimately, *i.e.*, below even the wholesale pricing.  (Ex. 1, Harthun Decl. ¶ 11.)

9.     A "myCharge Peak 6000" was purchased directly from the "Joe Roof Storefront."   It was not new, contrary to the representations of Defendant.   The product had stickers that are not placed by Plaintiffs including a sticker placed by a particular retailer ("ShopHQ"), which further confirmed that it was a returned item as damaged or defective and should never have been re-sold to the public pursuant to Plaintiffs' quality control procedure.  (Ex. 1, Harthun Decl. ¶ 16.)

10.     Defendant admitted that – using the Joe Roof and 1 Man's Trash Amazon storefronts – he sold a variety of products under the trademarks HoMedics, myCharge, HDMX Audio, or House of Marley.   Defendant produced an Amazon



Sales Report that confirmed the sales of trademarked goods.  (DN8, ¶ 5; Ex. 5, Beauvais Tr. at p. 23-24; Ex. 4, Dep. Ex. 7; Ex. 6, 1 Man's Trash Storefront.)

11.    Defendant admitted "products were mostly identified as being new and/or unused."  DN8, ¶ 26.

12.    Defendant asserted that he misrepresents the number of products that he has available.  DN8, ¶ 79.  Defendant testified that his "website is inflated" as "a marketing technique" because no one will buy a single item but the listing of multiple items gives the appearance of a retail "king" and he can remove the additional items once a consumer is induced to purchase the single item.  (Ex. 7, Court Tr. at p. 17-18.)

13.    Defendant admitted that but asserted that the products were identified and advertised using the Plaintiffs' trademarks, including professional photographs of the product bearing the trademarks, but asserted that "all professional photographs of the products as well as labeling skews and information are provided by Amazon.com to the storefronts."   DN8, ¶ 45.   He admitted in testimony, however, that he puts in the SKU and Amazon then asks "do you want to sell one like this. You click the button 'yes.'" (Ex. 7, Court Tr. at p. 14-15.)

14.    Defendant also admitted that he changed the name to 1 Man's Trash after being contacted by Plaintiffs.  DN8, ¶ 45.

15.    Defendant also admitted that he lacked knowledge whether the product sold to the employee of Plaintiffs as a new product was actually used.  DN8, ¶ 36.



16.     Defendant testified that all of Plaintiffs' products sold on Amazon were obtained from an auction of two storage units E-275 and E-267 at National Storage in Novi.  (Ex. 7, Court Tr. at p. 28-29; Ex. 5, Beauvais Tr. at 11, 24.)

17.     Defendant is a convicted felon on drug charges and is currently on probation.  (Ex. 5, Beauvais Tr. at 8-9.)

18.     Defendant claimed that he discovered Plaintiffs' product in the storage units "a few weeks" after the auction.  Defendant testified that he continued to rent the units before moving out and that only he had access to those lockers after the auction which was secured with his own lock.  (Ex. 5, Beauvais Tr. at 19-21.)

19.     Defendant acknowledged that pictures of the contents obtained from National Storage prior to auction do not show the goods in question.  He also acknowledged that no such product could be seen at the time of the auction looking into the units such that no one witnessed the product in the units at the time that he came into possession of the units.  (Ex. 8, Dep. Ex. 3; Ex. 9, Dep. Ex. 6; Ex. 5, Beauvais Tr. at p. 14, 17, 19.)

20.     Mark Hamway was the prior owner of the contents of the two storage units: E-275 and E-267.  (Ex. 10; Hamway Tr. at 19, 22; Ex.11, Dep. Ex. 2; Ex. 12, Dep. Ex. 5.)

21.     Mr. Hamway testified that he never kept products with Plaintiffs' Marks but only household goods as marked on the boxes that were labeled by his wife.  He further testified that nothing in his storage unit could have been sold as



new, unused unopened items. (Ex. 10; Hamway Tr. p. 10-11, 19-21, 24-26, 37; Ex. 13, Box photos.)

22.    Mr. Hamway was locked out of the two units in March 2013.   An overlock was placed on Unit E-275 on March 11, 2013 and an overlock was placed on Unit E-267 on March 25, 2013.   Consequently, Mr. Hamway had no ability to place any goods in either locker after March 25, 2013.   (Ex. 10; Hamway Tr. at 13-15, 18, 37; Ex. 11, Dep. Ex. 2; Ex. 12, Dep. Ex. 5.)

23.    Defendant's Facebook page further evidences that the products came from Plaintiffs' warehouse, as he up loaded a photograph of the Marley promotional van parked at Plaintiffs' warehouse, in an area only visible when standing on warehouse property.   (Ex. 5, Beauvais Tr. at p. 34-35; Ex. 14, Dep. Ex. 10.)

24.    It was evident to knowledgeable employees of Plaintiffs from an inspection of the inventory provided by Defendant that the majority of the products had come from the returns section of the warehouse.   For example, many of the products bore various retailer stickers.   (Ex. 1, Harthun Decl. ¶ 19-21.)

25.    In addition, one customer document provided by Defendant stated that he had sold out of the MyCharge Hub 6000 product in silver in October 2013 and only had red and blue available.   (Ex. 1, Amazon Customer Records).   Red and blue variations of that product were never sold on Amazon and, in fact, were limited to a special order for one retailer, ShopHQ.   That further confirmed that the product sold by Defendant involved customer returns.   (Ex. 1, Harthun Decl. ¶ 28.)



10

26.    The inspected inventory also could not be considered "new" products. Nearly all of the packaging showed signs of wear, sometimes significant. Some of the products were much older models that have not been sold to retailers since prior to 2013.   Many bore indications of re-sealing with non-factory stickers. (Ex. 1, Harthun Decl. ¶ 19-21.)

27.    At least nine of the items that Defendant sold were not available in the United States until after March 25, 2013, *i.e.*, the date after which Mr. Hamway no longer had any access to either storage unit.  (Ex. 1, Harthun Decl. ¶ 7-18; Ex. 11, Dep. Ex. 2; Ex. 12, Dep. Ex. 5; Ex. 15, Amazon Hub 3000/6000 Record.)

28.    The first import date/receipt into the warehouse from Asia of final production units is shown in the table below (Ex. 1, Harthun Decl., ¶ 18):

| SKU | Product Description | Model Number | Import Date |
|---|---|---|---|
| 254852 | Homedics HDS-2000 Deep Sleep II Relaxation Sound and White Noise Machine | HDS-2000 | 9/12/2013 |
| 10104 | The Sharper Image Brethe Air Cleaner with Nano Coil Technology | AR-NC01 | 8/8/2013 |
| 258745 | House of Marley EM-JH073-DN Liberate Denim On-Ear Headphones EM-JH073-DN | EM-JH073-DN | 8/2/2013 |
| 258645 | House of Marley EM-JE030-MI Uplift Midnight In-Ear Headphones | EM-JE030-MI | 7/18/2013 |
| 185586 | House of Marley EM-JE033-DR Uplift Drift In-Ear Headphones with Apple Three-Button Controller | EM-JE033-DR | 6/18/2013 |
| 225480 | myCharge Hub 3000 mAh Power Bank, RFAM-0228 (Silver) | RFAM-0228 | 5/2/2013 |
| 245863 | myCharge Hub 6000 mAh Power Bank, RFAM-0229 (Silver) | RFAM-0229 | 4/16/2013 |
| 10110 | HMDX JAM Party Wireless Boom Box, HX-P730PK (Pink) | HX-P730PK | 4/16/2013 |
| 70 | House of Marley EM-JA002-MI Marley Roots Rock Bluetooth Portable Audio System | EM-JA002-MI | 4/3/2013 |



29.     Defendant also produced selected customer records and the comments therein further proved that the goods had not been obtained from the storage units, where inventory that was "sold out" in October was replenished in November, as seen below from Ex. 16, Amazon Customer Records:

| | |
|---|---|
| **myCharge Hub 6000 mAh Power Bank, RFAM-0229 (Silver)**<br><br>**SKU:** 245863<br>**ASIN:** B00CGY4KHM<br>**Listing ID:** 0920NTBGF8P<br>**Order-Item ID:** 66539182142738<br>**Condition:** New<br>**Comments:** Sold out of SILVER !Only RED and BLUE available.Please specify color when ordering. | **myCharge Hub 6000 mAh Power Bank, RFAM-0229 (Silver)**<br><br>**SKU:** 245863<br>**ASIN:** B00CGY4KHM<br>**Listing ID:** 0920NTBGF8P<br>**Order-Item ID:** 51458783064090<br>**Condition:** New |
| 10/6/13 Sale | 11/21/13 Sale |

30.     For another sale in Ex.16, Amazon Customer Records, Defendant represented that the unpackaged product for sale had been "refurbished" and "showcased display models." Defendant could not be able to make this statement in honesty if he had found this product in the storage units as he contends.

31.     To protect the brand, Plaintiffs implemented a policy against the sale of returned goods to ensure the highest quality of the product. As part of its quality control procedures for returned goods, Plaintiffs do not sell refurbished or reconditioned goods. Instead, the product is generally destroyed or, for certain products that are defective, the product is returned to the manufacturing site in Asia as part of a defective returns process. (Ex. 1, Harthun Decl. ¶ 22.)

32.     The sale of previously returned goods poses a significant risk that negative comments will be posted on Internet websites, thus resulting in damage to



the brand and Plaintiffs' reputation. (Ex. 1, Harthun Decl. ¶ 23.)

33.    The products being sold by Defendant do not meet Plaintiffs' quality and customer service standards, and Plaintiffs' never authorized those products to be re-sold to the public.  (Ex. 1, Harthun Decl. ¶ 24.)

34.    Plaintiffs warranty coverage extends for one year from the date of original purchase.  The warranty does not extend to older models and products that were subject to prior returns.  Plaintiffs may choose to accommodate customers at its discretion on a case by case basis.  (Ex. 1, Harthun Decl. ¶ 27.)

35.    The Amazon policy requires "new" to be new (Ex. 17, Amazon Policy):

> *New:* Just like it sounds. A brand-new, unused, unopened item in its original packaging, with all original packaging materials included. Original protective wrapping, if any, is intact. Original manufacturer's warranty, if any, still applies, with warranty details included in the listing comments.

36.    Plaintiffs only provide brand new, quality-controlled products to its authorized U.S. distributors and retailers. (Ex. 1, Harthun Decl. ¶ 25-26.)

37.    To counter arguments that he could not know that the product was new and working, Defendant testified before Magistrate Judge Randon that he opened everything that he sold (repeating what he had told counsel):

> Everything that I sold, when he says it was opened, I test it to make sure that the stuff was in brand new packages, brand new boxes.  . . . It was in brand new boxes, okay? But I wanted to make sure what it says on the thing is really in the box. **So I did open the boxes**.

> (Ex. 7, Court Tr. at p. 18) (emphasis added).



## V.    ARGUMENT

Defendant has been brazen in selling goods stolen from the returns section of Plaintiff's warehouse on the largest Internet retailer Amazon as new product at cut-rate pricing without any evidence that a legitimate first sale of the product occurred.   As a convicted felon and with a familiarity of the legal process, Defendant has acted consistent with a belief that the case against him could not be proven beyond a reasonable doubt, relying only upon mere possibilities that he could have found all of the product sold on Amazon in two storage units auctioned in May 2013.   Even accepting this without any supportive evidence whatsoever, the first sale defense is inapplicable because he can only speculate as to a first authorized sale and that the product is genuine and new.   The evidence proves both of those things to be untrue.

The burden of proof, moreover, is on him to identify evidence supporting the first sale defense.   The evidence is conclusive that Defendant has not been truthful about his product source – meaning that he knows the goods were not obtained through appropriate channels. He also ignores that he improperly used advertisements, product descriptions and photographs bearing Plaintiff's trademarks and improperly sold the products as "new" or, for certain product, as prior "show cased display models!!" when he could not know the truth of such statements when he claims to have "found" the goods without any knowledge of the history of the products.



14

## A.    A First Sale Defense Has Not and Cannot be Proven by Defendant

### 1.    Defendant Cannot Prove an Actual First Sale

Defendant cannot prove an authorized sale by the trademark owner – and his claim that he found the goods in the storage units is devoid of any connection to a legitimate sale by Plaintiffs.  "[T]he statute by its very terms protects against confusion not only with respect to whether the goods are what they purport to be, but with respect to the origin, sponsorship, **or approval** of those goods" by the trademark owner.  *Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369, 380 (S.D.N.Y. 2000) (emphasis added).  "If the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established."  *Id.* at 382.  Plaintiffs never authorized and approved a first sale of the goods – thus summary judgment is warranted that the first sale defense is inapplicable as a matter of law.

The storage locker contention signifies no more than a lack of knowledge as to the initial source of the goods.  Thus, Plaintiffs' significant evidence that the product is returned product that was never subject to a first sale cannot and has not been rebutted.  Mystery storage units goods cannot be sold as new – just as parts purchased on eBay from an unknown source did not pass muster as a first sale defense in *Ford*, 911 F. Supp. 2d at 620.  In *Ford*, Defendants could not know where the parts came from or where they were produced before they arrived in their



15

possession and the court concluded that the Defendants could only "speculate" that the products were "produced by Ford and purchased within Ford's supply chain," warranting summary judgment of trademark infringement. *Id.*

Similarly, in *Too, Inc. v. TJX Companies, Inc.*, 229 F. Supp. 2d 825, 834 (S.D. Ohio 2002), the court held that the first sale defense was inapplicable where "garments were not authorized for production in the first place" and thus not "genuine," rejecting unsupported contention that garments were overruns authorized by Plaintiff when "Defendant has presented no evidence to support this assertion." The first sale defense simply cannot be met by asserting "that the articles are legitimate and, without disclosing their source, were purchased from those who bought from the plaintiff." *Green*, 132 F.2d at 314.

In addition, Defendant's claim that he purchased the goods in a one-time auction of two storage units in May 2013 has been shown to be false. The prior owner of the lockers testified definitively that he did not have such products in the lockers. Pictures of the lockers from the front do not show any indication that such a large amount of goods would be concealed within. The smoking gun was found when the Amazon sales report revealed that at least nine items – including one of the biggest sellers – had not been manufactured and imported into the U.S. before Mr. Hamway was locked out of these storage units in March 2013. The Amazon sales records also confirm that the product sold was in a continuous state of flux in



a manner inconsistent with a one-time purchase.  Indeed, Defendant "sold out" of the silver Hub 6000 in October 2013 for one month and then resumed sales in November 2013.   The defense fails as a matter of law where the Defendant has no evidence of a legitimate authorized first sale.

### 2.    Misrepresentations Preclude a First Sale Defense

The first sale doctrine is inapplicable if the "whole truth" is not provided to potential purchasers.  *Dell,* 2007 WL 2903845 at * 4.  Here, the misrepresentation was egregious:   the product was falsely sold as new.[1]   The Peak 6000 product purchased by Plaintiffs was not new.  Moreover, the inspection of the inventory of unsold goods confirmed that the goods were from the returns section of the warehouse.  The defense is thus inapplicable as a matter of law.

### 3.    Material Differences Preclude a First Sale Defense

The first sale doctrine does not apply when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner.  The products at issue are not "genuine" because the products were sold as new rather than used, as discussed *supra*.

---

[1] While selling a returned product as "new" alone negates any first sale defense, Defendant is guilty of other misrepresentations.  For example, Defendant testified that the quantities shown on his Amazon storefront were fake as a marketing tool. The façade to make himself appear to be an authorized dealer is another material misrepresentation, as was the use of photographs of new products in association with his sale of product without any disclaimers or explanation.



The goods are also not "genuine" because distribution of returned goods is contrary to the quality control process established by Plaintiffs which does not include selling or refurbishing returned product. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc*., 982 F.2d 633, 641 (1st Cir.1992); *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991). The returned product would also not be subject to warranty coverage. Reselling products with inferior warranties also constitutes a material difference negating the first sale defense. *See Perkins School for the Blind v. Maxi–Aids, Inc.*, 274 F.Supp.2d 319, 324 (E.D.N.Y.2003); *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1073 (10th Cir. 2009); *J. C. Penney Co. v. Charbeth's Little General Store*, 185 U.S.P.Q. 254 (E.D.N.Y.1975) (out of style merchandise). Thus, the material differences eliminate a first sale defense as a matter of law.

**B.   Likelihood of Confusion is Presumed and Met by the *Frisch* Test**

Confusion is a certainty. The goods bear Plaintiffs trademarks. Customers will mistakenly believe that Defendants goods emanate from or are authorized and approved by Plaintiffs and thus would be confused as to the source/approval of the involved goods. *See Wynn Oil Co. v. American Service Corp.*, 943 F.2d 595, 608 (6th Cir. 1991). A presumption of likelihood of confusion is applicable for two independent reasons: 1) the grey goods presumption applicable to unauthorized returned goods and 2) the presumption based on the intent to derive value from the



18

goodwill of the trademark owner.  Even apart from the applicable presumption, the *Frisch* test is emphatically met here where the products bore Plaintiff's trademark and were sold as authorized, brand-new products on the largest Internet retail site in the world in competition with the actual goods of Plaintiffs.

### 1.   Material Differences Warrant Likelihood of Confusion Presumption

For goods bearing a registered trademark, "when a defendant sells a product that is materially different ... it is presumed likely that the undisclosed difference between the products will confuse consumers." *Bel Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 223-4 (S.D. N.Y. 2011); *Societe Des Produits Nestle*, 982 F.2d at 641.  For the reasons *supra*, the product sold by Defendant was materially different – not new, opened, worn packaging, from returns section and not production, and without warranty – than the genuine production goods provided by Plaintiffs to their authorized U.S. distributors and retailers.  The presumption of confusion is applicable.  *See also Ford*, 911 F.Supp.2d at 622.

### 2.   Defendant's Intent Warrants Likelihood of Confusion Presumption

A likelihood of confusion can be found as a presumption if the defendant intended to derive benefit from the plaintiff's trademark. *General Motors Corp. v. Autovation Technologies, Inc.*, 317 F.Supp.2d 756, 761 (E.D.Mich. 2004) ("likelihood of confusion is presumed when a defendant intentionally copies a



trademark design 'with the intent to derive a benefit from the reputation of another'"); *Am. Farm Bureau Fed'n v. Alabama Farmers Fed'n*, 935 F. Supp. 1533, 1548 (M.D. Ala. 1996), aff'd, 121 F.3d 723 (11th Cir. 1997); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1542 (11th Cir. 1986). Defendants sold products using the Plaintiffs' trademarks as new products on the largest Internet retailer using product descriptions and photographs of new products in order to maximize the value of the moneys received, *i.e.*, to derive the greatest benefit possible from the goodwill of Plaintiffs. The presumption of confusion is thus applicable.

### 3. The *Frisch* Test Establishes Likelihood of Confusion

Likelihood of confusion is established as a matter of law under the *Frisch* test:

**(1) Strength of mark.** The strength of Plaintiff's trademarks has not and cannot be disputed. Plaintiffs invest substantially in its well-known marks. (Ex.1, Harthun Decl. ¶ 3-10.) In addition to commercial strength, all of these marks, having no qualities inherently related to the products, qualify as "arbitrary or fanciful" trademarks entitled to the strongest level of protection.

**(2) Relatedness of the goods.** Defendants' goods sold as new compete directly with genuine goods of the Plaintiffs, its U.S. distributors and retailers.

**(3) Similarity of the marks.** The marks are identical in all respects. Defendant admits that the products were advertised and sold with trademark-bearing packaging and images on Amazon site.



**(4) Evidence of actual confusion.** Defendant produced selected customer records to assert that customers were satisfied with Defendant. This evidences actual confusion in that Defendant's customers expressed a belief that they obtained the brand-new product of Plaintiffs as advertised by Defendant on the Amazon website, which was not the case. (*See* Ex. 16, Amazon Customer Records; Ex. 1, Harthun Decl. ¶ 27). Even so, lack of actual confusion "is rarely significant" and this factor can be no more than neutral. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 284 (6th Cir.1997).

**(5)     Marketing channels used.** Defendants marketed the goods on Amazon website in direct competition with authorized retailers such as Amazon.

**(6)     Degree of purchaser care.** Purchasers would be unable to distinguish between authorized goods that have been subject to Plaintiffs' quality control procedures and Defendants' goods from the returns section of Plaintiffs' warehouse – and would attribute problems to the brand. (Ex. 1, Harthun Decl. ¶ 19-20, 24, 28.) Further, the images on Amazon associated with Defendant's sales on which the purchaser based its decision depicted new products and the purchaser only received the non-new product after the purchase.

**(7)     Defendant's intent.** As discussed *supra*, Defendant intended to capitalize on the demand for the brand of the products as a result of the esteem that they hold in the marketplace.



(8)   **Likelihood of expansion of the product lines.**   The "direct competition" places this factor "heavily" on the scale toward confusion.   *See General Motors*, 317 F.Supp.2d *Id.* at 763.

Thus, the facts are not in dispute and all of the *Frisch* factors weigh toward a strong likelihood of confusion with none weighing against confusion.   Thus, summary judgment of likelihood of confusion as a matter of law is merited.

## C.   Summary Judgment of Unfair Competition is Merited

The analysis and factors considered in assessing an unfair competition claim under § 1125 are the same as employed under § 1114 in assessing a claim for trademark infringement.   *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1122–23 (6th Cir. 1996).   Thus, summary judgment is warranted on the unfair competition claim for the same reasons stated above.

## D.   Summary Judgment of False Advertising is Merited

Defendant has no defense to selling used and formerly returned products as "new" which separately constitutes false advertising.   The purchase by Plaintiffs of the returned Peak 6000 that was sold as new establishes false advertising. Defendant admitted to lacking knowledge to dispute this.   In addition, Defendant admitted in testimony before this Court that he opened everything that he sold. (Ex. 7, Court Tr. at p. 18).   In addition, Defendant misrepresented another product as



"refurbished" (and a showcase display). He also admitted to misrepresenting the number of units available for sale.

False advertising is plain: consumers will be deceived by the false statement of description of the material qualities of the goods as new and sold with good title, as prohibited by the Lanham Act. *See* 15 U.S.C. § 1125(a). "Where statements are literally false, a violation may be established without evidence that the statements actually misled consumers" and "[a]ctual deception is presumed." *American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir.1999). The literally false statement that the goods were "new" when the goods were returned items warrants summary judgment of false advertising.

## E.    Disgorgement of Profit Damages

A prevailing plaintiff in a trademark infringement case may, under certain circumstances, recover a defendant's profits subject to the principles of equity. 15 U.S.C. § 1117(a). "[T]he Lanham Act ... expressly confers upon district judges wide discretion in determining a just amount of recovery for trademark infringement." *LaQuinta Corp. v. Heartland Properties, LLC*, 603 F.3d 327, 342 (6th Cir.2010). An award of disgorgement of profits may be warranted under various rationales, such as unjust enrichment, deterrence, and compensation. *Laukus v. Rio Brands, Inc.*, 391 F. App'x 416, 424 (6th Cir. 2010). That decision also affirmed that



23

"showing willfulness is not required," but that "willfulness is one element that courts may consider in weighing the equities." *Id.* Plaintiffs established the serious problems caused by Defendant's extremely low pricing below wholesale pricing, the misrepresentations of the products as new, and the resulting damage to its business relationships. Sale of products slated for destruction immeasurably damages the reputation of Plaintiffs' products and Plaintiffs' goodwill. This also causes significant confusion in the marketplace as to the approval of the products, as backed by Plaintiffs' goodwill and quality assurance. Defendant has been brazen in selling the returned product on the largest Internet retailer at sharply lower prices without any evidence supporting a first sale defense.

No dispute exists as to the total sales provided by Defendant in the Amazon Seller report of $24,330.63 with a total payment to Defendant after Amazon seller fees of $20,849.29 between August 1, 2013 and December 31, 2013. (*See* Ex. 18, Amazon Seller Report). Defendant also provided an excel file exported from his Amazon account that itemizes the sales made during that timeframe, in which it appears that sales involving non-Homedics branded products amounted to only about $500. Pursuant to §1117(a), Plaintiffs respectfully submit that it is entitled "to recover (1) defendant's profits" and need only "prove defendant's sales only;



defendant must prove all elements of cost or deduction claimed."[2]   An award of $20,000 is thus established by the undisputed evidence.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that this Court should enter summary judgment of trademark infringement, unfair competition and false advertising.  Further, Plaintiffs request that this Court hold that Plaintiffs are entitled to disgorgement of profits in the amount of $20,000.

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

Dated:  <u>May 30, 2014</u>

<u>  /s/    Linda D. Mettes                              </u>
Mark A. Cantor (P32661)
Linda D. Mettes (P69182)
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Tel:  (248) 358-4400 / Fax:  (248) 358-3351
Email:  mcantor@brookskushman.com
            lmettes@brookskushman.com

*Attorneys for Plaintiffs*

---

[2] The court may also, in its discretion, enhance the resulting award up to three times the amount of damages as justice shall require. 15 U.S.C. § 1117(a). Enhancement of damages, the existence of other damages, attorney fees, costs and/or the need for corrective action can be determined at a later date, if necessary.



## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

I hereby certify that on <u>May 30, 2014</u>, I electronically filed the foregoing **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, FALSE ADVERTISING AND DAMAGES and BRIEF IN SUPPORT** with the Clerk of the Court for the Eastern District of Michigan using the ECF System which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

I also certify that I have mailed by United States Postal Service the paper to the following non-participants in the ECF System:

John Joseph Beauvais
2900 East Jefferson
Apt. D-400
Detroit, MI 48207

**BROOKS KUSHMAN P.C.**

  /s/   Linda D. Mettes
Mark A. Cantor (P32661)
Linda D. Mettes (P69182)
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Tel:  (248) 358-4400 / Fax:  (248) 358-3351
Email:  mcantor@brookskushman.com
          lmettes@brookskushman.com

*Attorneys for Plaintiffs*

