UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RFA BRANDS, LLC, *et al.*                         Case No. 13-14615

              Plaintiffs,                    Gerald E. Rosen
v.                                                United States District Judge

JOHN JOSEPH BEAUVAIS, *et al*,                    Michael Hluchaniuk
                                                  United States Magistrate Judge

            Defendants.
_____/

## REPORT AND RECOMMENDATION
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Dkt. 24)

## I.     PROCEDURAL HISTORY

On November 6, 2013, plaintiffs RFA Brands, LLC, FKA Distributing Co.,
LLC and House of Marley, LLC (collectively "plaintiffs") filed this lawsuit
against defendant Joseph Beauvais ("defendant" or "Beauvais"), asserting, in part,
claims for trademark infringement, unfair competition, false advertising and
damages. (Dkt. 1). The parties subsequently agreed to the entry of a stipulated
preliminary injunction. (Dkt. 13). On April 11, 2014, this matter was referred to
the undersigned for all pretrial purposes. (Dkt. 23). On May 30, 2014, plaintiffs
filed the instant motion for summary judgment on their claims for trademark
infringement, unfair competition, and false advertising. (Dkt. 24).[1] Defendant

_____

[1]Plaintiffs did not move for summary judgment on their remaining claims: Count III,
Claim and Delivery; Count IV, Quantum Meruit/Unjust Enrichment; Count V, Statutory and

1

filed his response on July 14, 2014 (Dkt. 26), and plaintiffs filed their reply brief in support of their motion on July 28, 2014.  (Dkt. 27).  Pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), the motion will be determined without oral argument.  (Dkt. 25).  This motion is now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS** that plaintiffs' motion for partial summary judgment be **GRANTED** and that plaintiffs be awarded damages for lost profits in the amount of **$20,000.00**.

## II.    FACTUAL BACKGROUND

Plaintiffs manufacture and market numerous products, including charging devices for electronics, consumer health, wellness and electronics lifestyle products, and innovative audio systems, headphones, and accessories.  (Dkt. 1, Compl. ¶¶ 11-13).  Plaintiffs own numerous Federally-registered trademarks for their brands, including HoMedics, myCharge, HDMX Audio, The Sharper Image and House of Marley. (Dkt. 24, Ex. 2, Ferber Decl. ¶ 10 and Ex. A).  Plaintiffs assert that their products have become popular because they utilize innovative technology and subject their products and services to a rigorous set of quality and customer service standards. (Dkt. 24, Ex. 1, Harthun Decl. ¶ 6).  Plaintiffs have

Common Law Conversion; Count VI, Unfair Trade Practices; Count VII, Intentional Interference with Business Expectancy; Count VIII, Tortious Interference with Contract; Count IX, Fraud; and Count X, Civil Conspiracy.

invested millions of dollars marketing and advertising the brands worldwide and in a variety of media, including television, radio, newspapers, magazines, and the Internet. (Dkt. 24, Ex. 1, Harthun Decl. ¶ 7-8). All plaintiffs utilize the same warehouse for distribution of their products, located in Commerce Township, Michigan. (Dkt. 1, Compl. ¶ 20).

On August 28, 2013, plaintiffs discovered that their products were being offered for sale on the Amazon.com website by an individual using the name "Joe Roof," and that the products were being offered for sale as new products for prices well below the retail value and wholesale prices of the products. (Dkt. 24, Ex. 1 Harthum Decl. ¶ 11). The wide scope of plaintiffs' products offered for sale on the Joe Roof Storefront has never been available from any single distributor or retailer of plaintiff's products. (*Id*. ¶ 14). In fact, plaintiffs' Commerce Township warehouse is the only location where all the products are available in one location. (*Id.*)

Plaintiffs purchased a "myCharge Peak 6000" from the Joe Roof Storefront, and, upon receipt, the packaging for the product listed the seller's name as "J. Beauvais," with a Detroit address and telephone number belonging to defendant Beauvais. (*Id.* ¶ 16). Defendant admitted selling plaintiffs' products using the Joe Roof and 1 Man's Trash Storefronts on Amazon.com. (Dkt. 24, Ex. 5, Beauvais Dep. pp. 23-24; Ex. 4, Dep Ex. 7; Ex. 6). Plaintiffs assert that an inspection of the

3

product received revealed that it was used, and not new, as had been represented, and plaintiffs determined that the product had been returned to the warehouse as damaged or defective and should never have been re-sold to the public.  (Dkt. 24, Ex. 1, Harthun Decl. ¶ 16).  The Peak 6000 had stickers on it that are not placed by plaintiffs, including a sticker placed by a particular retailer, ShopHQ, confirming that this was a returned item as damaged or defective and that it should never have been resold to the public.  (*Id.*)

Defendant offered a wide variety and significant quantity of plaintiffs' products (including numerous SKU's of each product) identified as new and/or unused, and advertised under plaintiffs' trademarked brand names and labels, including Homedics, MyCharge, HMDX Audio, The Sharper Image, and House of Marley.  (Dkt. 24, Ex. 1, Harthun Decl. ¶ 13).  In the product offerings on Amazon, these trademarks were featured in product literature and product images that were provided to customers considering purchase of the products.  (*Id.*)  Both the SKU's and quantities of offered plaintiffs' products changed significantly over time and appeared to be frequently replenished, which was indicative of a continuous supply.  (Dkt. 24, Ex. 1, Harthun Decl. ¶ 15; Ex. 4, Dep. Ex. 7).  Defendant Beauvais was selling a large number of plaintiffs' products as new products on Amazon for substantially less than even the wholesale pricing. (Dkt. 24, Ex. 1, Harthun Decl. ¶ 11).  The Sales Report produced by defendant

4

confirmed the sales of trademarked goods.  (Dkt. 8, ¶ 5; Dkt. 24, Ex. 5, Beauvais

Tr. at pp. 23-24; Ex. 4, Dep. Ex. 7; Ex. 6, 1 Man's Trash Storefront).  Defendant

admitted "products were mostly identified as being new and/or unused," (Dkt. 8,

¶ 26), and defendant asserted that he misrepresents the number of products that he

has available. (Dkt. 8, ¶ 79).  Defendant testified that his "website is inflated" as

"a marketing technique" because no one will buy a single item but the listing of

multiple items gives the appearance of a retail "king," and he can then remove the

additional items once a consumer is induced to purchase the single item.  (Dkt. 24,

Ex. 7, Court Tr. at pp. 17-18).  Defendant admitted that, and asserted that the

products were identified and advertised using the plaintiffs' trademarks, including

professional photographs of the product bearing the trademarks, but claimed that

"all professional photographs of the products as well as labeling [SKUs] and

information are provided by Amazon.com to the storefronts."  (Dkt. 8, ¶ 48). He

admitted in testimony, however, that he puts in the SKU and Amazon then asks

"do you want to sell one like this. You click the button 'yes.'" (Dkt. 24, Ex. 7,

Court Tr. at pp. 14-15).  Defendant also admitted that he changed the name to "1

Man's Trash" after being contacted by plaintiffs.  (Dkt. 8, ¶ 45).  And, defendant

admitted that he lacked knowledge whether the product sold to the employee of

plaintiffs as a new product was actually used.  (Dkt. 8, ¶ 36).

 Defendant testified that all of plaintiffs' products sold on Amazon were

obtained from an auction of two storage units, E-275 and E-267, at National Storage in Novi.  (Dkt. 24, Ex. 7, Court Tr. at pp. 28-29; Ex. 5, Beauvais Tr. at pp. 11, 24).  Defendant testified that he discovered plaintiffs' product in the storage units "a few weeks" after the auction, that he continued to rent the units before moving out, and that only he had access to those lockers after the auction which was secured with his own lock. (Dkt. 24, Ex. 5, Beauvais Tr. at pp. 19-21). Defendant acknowledged that pictures of the contents obtained from National Storage prior to auction do not show the goods in question, and that no such product could be seen at the time of the auction looking into the units so that no one witnessed the product in the units at the time that he came into possession of the units.  (Dkt. 24, Ex. 8, Dep. Ex. 3; Ex. 9, Dep. Ex. 6; Ex. 5, Beauvais Tr. at pp. 14, 17, 19).  Mark Hamway was the prior owner of the contents of the two storage units, E-275 and E-267 (Dkt. 24, Ex. 10, Hamway Tr. at pp. 19, 22; Ex.11, Dep. Ex. 2; Ex. 12, Dep. Ex. 5), and he testified that he never kept products with plaintiffs' Marks in the units, but only household goods as marked on the boxes that were labeled by his wife, and that nothing in his storage units could have been sold as new, unused, unopened items. (Dkt. 24, Ex. 10 Hamway Tr. pp. 10-11, 19-21, 24-26, 37; Ex. 13, Box photos).  Mr. Hamway was locked out of the two units in March 2013, and an overlock was placed on Unit E-275 on March 11, 2013 and an overlock was placed on Unit E-267 on March 25, 2013. Consequently, Mr.

6

Hamway had no ability to place any goods in either locker after March 25, 2013. (Dkt. 24, Ex. 10; Hamway Tr. pp. 13-15, 18, 37; Ex. 11, Dep. Ex. 2; Ex. 12, Dep. Ex. 5).

Defendant's Facebook page shows a photograph of the Marley promotional van parked at plaintiffs' warehouse, which plaintiffs contend is in an area only visible when standing on warehouse property.  (Dkt. 24, Ex. 5, Beauvais Tr. at pp. 34-35; Ex. 14, Dep. Ex. 10).  And, plaintiffs assert that it was evident to their employees from an inspection of the inventory provided by defendant that the majority of the products had come from the returns section of the warehouse.  For example, many of the products bore various retailer stickers, and some of the goods showed indications of having been opened and improper packaging. (Dkt. 24, Ex. 1, Harthun Decl. ¶¶ 19-21).  In addition, one customer document provided by defendant stated that he had sold out of the MyCharge Hub 6000 product in silver in October 2013, and only had red and blue available. (Dkt. 24, Ex. 16, Amazon Customer Records). However, red and blue variations of that product were never sold on Amazon and, in fact, were limited to a special order for one retailer, ShopHQ, which further demonstrates that the product sold by defendant involved customer returns.  (Dkt. 24, Ex. 1, Harthun Decl. ¶ 28).

The inspected inventory also could not be considered "new" products because nearly all of the packaging showed signs of wear, sometimes significant.

Some of the products were much older models that have not been sold to retailers since prior to 2013, and many bore indications of re-sealing with non-factory stickers.  (Dkt. 24, Ex. 1, Harthun Decl. ¶¶ 19-21).  At least nine of the items that defendant sold were not available in the United States until after March 25, 2013, *i.e.*, the date after which Mr. Hamway no longer had any access to either storage unit.  (Dkt. 24, Ex. 1, Harthun Decl. ¶¶ 7-18; Ex. 11, Dep. Ex. 2; Ex. 12, Dep. Ex. 5; Ex. 15, Amazon Hub 3000/6000 Record).  Defendant also produced selected customer records and the comments therein further demonstrated that inventory that was "sold out" in October was replenished in November.  (Dkt. 24, Ex. 16). In another sale, defendant represented that the unpackaged product for sale had been "refurbished" and "showcased display models."  (*Id.*)  Plaintiffs contend that defendant could not make this statement in honesty if he had found this product in the storage units as he contends.

To protect the brand, plaintiffs implemented a policy against the sale of returned goods to ensure the highest quality of the product.  As part of its quality control procedures for returned goods, plaintiffs do not sell refurbished or reconditioned goods.  Instead, the product is generally destroyed or, for certain products that are defective, the product is returned to the manufacturing site in Asia as part of a defective returns process.  (Dkt. 24, Ex. 1, Harthun Decl. ¶ 22). Plaintiffs assert that the sale of previously returned goods poses a significant risk

8

that negative comments will be posted on Internet websites, thus resulting in damage to the brand and plaintiffs' reputation. (Dkt. 24, Ex. 1, Harthun Decl. ¶ 23). Plaintiffs assert that the products being sold by defendant do not meet plaintiffs' quality and customer service standards, and plaintiffs' never authorized those products to be re-sold to the public. (Dkt. 24, Ex. 1, Harthun Decl. ¶ 24). Further, plaintiffs' warranty coverage extends for one year from the date of original purchase, and the warranty does not extend to older models and products that were subject to prior returns. However, plaintiffs may choose to accommodate customers at its discretion on a case-by-case basis. (Dkt. 24, Ex. 1, Harthun Decl. ¶ 27).

The Amazon policy requires "new" to be new:

> *New*: Just like it sounds. A brand-new, unused, unopened item in its original packaging, with all original packaging materials included. Original protective wrapping, if any, is intact. Original manufacturer's warranty, if any, still applies, with warranty details included in the listing comments.

(Dkt. 24, Ex. 17, Amazon Policy). Plaintiffs only provide brand new, quality-controlled products to its authorized U.S. distributors and retailers. (Dkt. 24, Ex. 1, Harthun Decl. ¶¶ 25-26). To counter arguments that he could not know that the product was new and working, defendant testified in Court that he opened everything that he sold:

> Everything that I sold, when he says it was opened, I test
> it to make sure that the stuff was in brand new packages,
> brand new boxes. . . . It was in brand new boxes, okay?
> But I wanted to make sure what it says on the thing is
> really in the box. **So I did open the boxes**.

(Dkt. 24, Ex. 7, Court Tr. at p. 18) (emphasis added).

## III.   DISCUSSION

### A.   Standard of Review

Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 282 (2012).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011).

A party asserting that a fact cannot be genuinely disputed must support the assertion as specified in Rule 56(c)(1).  Once the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings.  Fed. R. Civ. P. 56(e)(2), (3); *see Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009).  The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990).  "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'"  *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see also Donald v. Sybra, Inc.*, 667 F.3d 757, 760-61 (6th Cir. 2012).

A moving party with the burden of proof faces a "substantially higher hurdle."  *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  The moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial.  "But where the moving party has the burden–the plaintiff on a claim for relief or the defendant on an affirmative defense–his showing must be sufficient

for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)).  The Court of Appeals has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and "'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET. AL. MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000)); *see Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012); *Cockrel*, 270 F.3d at 1056.  Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### B.     Trademark Infringement, 15 U.S.C. § 1114

A claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, requires a plaintiff to show "(1) that it owns a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) there was a likelihood of consumer confusion." *Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp.2d 616, 621 (E.D. Tenn.

12

2012) (quoting *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.*, 363 F.

Supp.2d 952, 957 (S.D. Ohio 2005)).  Defendant does not contest the validity of

plaintiffs' trademarks, and the undersigned concludes that plaintiffs' trademarks

are indeed valid and protectable.  Defendant admits selling products in packaging

bearing plaintiffs' trademark, and using the internet in furtherance of his business,

and thus admits to using the plaintiffs' mark in commerce.  *See Ford Motor Co.*,

911 F. Supp.2d at 621-22 (noting that defendants' use of the Internet in

furtherance of its business, which is "an instrumentality of interstate commerce").

As for the third element, "[t]he touchstone of liability under § 1114 is

whether the defendant's use of the disputed mark is likely to cause confusion

among consumers regarding the origin of the goods offered by the parties." *Ford*

*Motor Co.*, 911 F. Supp.2d at 622 (quoting *Daddy's Junky Music Stores, Inc. v.*

*Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)).  The Sixth

Circuit considers the following eight factors when determining whether the mark

is likely to cause confusion: (1) strength of the plaintiff's mark; (2) relatedness of

the goods or services; (3) similarity of the marks; (4) evidence of actual confusion;

(5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the

defendant in selecting the mark; and (8) likelihood of expansion of the product

lines. *Ford Motor Co.*, 911 F. Supp.2d at 622 (citing *Abercrombie*, 363 F.

Supp.2d at 959, citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*,

13

670 F.2d 642 (6th Cir. 1982)).  "[T]hese factors are a guide and [ ] they need not

be analyzed with mathematical precision . . . . '[a] party claiming infringement

need not show all, or even most, of these factors in order to prevail.'" *Ford Motor

Co. v. Lloyd Design Corp.*, 184 F. Supp2d 665, 669 (E.D. Mich. 2002) (quoting

*Esercizio v. Roberts*, 944 F.2d 1235, 1242 (6thCir. 1991)).

Plaintiffs assert that confusion here is a certainty, as customers would be

confused as to the source/approval of the goods at issue, and contend that the

*Frisch* test establishes likelihood of confusion.  Plaintiffs offer evidence that:

(1) the strength of their trademarks is undisputed; (2) defendant's goods sold as

new compete directly with goods of the plaintiffs and their U.S. distributors and

retailers; (3) the marks are identical in all respects; (4) defendant's customers are

confused in that they believed they were purchasing brand new product of

plaintiffs, as advertised by defendant, which was not the case; (5) defendant

marketed the goods on the Amazon website in direct competition with authorized

retailers such as Amazon; (6) purchasers would be unable to distinguish between

authorized goods and defendant's goods, and would attribute any problems to the

brand; (7) defendant intended to capitalize on the demand for the brand of the

products; and (8) defendant's "direct competition" with plaintiffs demonstrates a

likelihood of expansion of the product lines.  (Dkt. 24, Pg ID 242-44, citing Ex. 1,

Harthun Decl. ¶¶ 3-10, 19-20, 24, 27-28; Ex. 16, Amazon Customer Records).

Defendant does not offer any evidence disputing the likelihood of confusion resulting from his use of plaintiffs' trademarks in the advertising and sale of the products.  Further, as discussed more fully below, the product sold by defendant was materially different than the genuine production goods provided by plaintiffs to their authorized U.S. distributors and retailers, and "when a defendant sells a product that is materially different . . . it is presumed that the undisclosed difference between the products will confuse consumers."  *Bel Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp.2d 208, 223-24 (S.D.N.Y. 2011).[2]  Accordingly, a finding of likelihood of confusion is warranted in this case, and plaintiffs have established their claim for trademark infringement.

## C.    First Sale Defense

Defendant here instead argues that the "first sale" doctrine applies as a defense to plaintiffs' claim of trademark infringement.  As explained by the Sixth Circuit:

> trademark law contains a "first sale"exception that
> provides a defense to claims of infringement.  Under the
> exception, resale by the first purchaser of the original
> trademarked item is generally neither trademark
> infringement nor unfair competition.  The rationale for
> the rule "is that trademark law is designed to prevent

---

[2]Plaintiffs also argue that defendant's intention to derive benefit from plaintiffs' trademark also warrants a presumption of confusion, citing *General Motors Corp. v. Autovation Technologies, Inc.*, 317 F. Supp.2d 756, 761 (E.D. Mich. 2004).  However, the undersigned finds *General Motors Corp.* distinguishable, as that case involved the defendant's use and misappropriation of precise counterfeits of the genuine products, a claim not made in this case.

> sellers from confusing or deceiving consumers about the
> origin or make of a product, which confusion ordinarily
> does not exist when a genuine article bearing a true mark
> is sold."

*Brilliance Audio, Inc. v. Haights Cross Comm'cns, Inc.*, 474 F.3d 365, 369 (6th

Cir. 2007) (citations omitted).  However, "the first sale doctrine does not apply

'when an alleged infringer sells trademarked goods that are materially different

than those sold by the trademark owner."  *Id.* (quoting *Davidoff & CIE, S.A. v.

PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001)).[3]  "To be material, a

difference must be 'one that consumers consider relevant to a decision about

whether to purchase a product.'  But, '[b]ecause a myriad of considerations may

influence consumer preferences, the threshold of materiality must be kept low to

include even subtle differences between products.'"  *Id.* (quoting *Davidoff & CIE,

S.A.*, 263 F.3d at 1302).  "A guiding principal in evaluating whether a difference

between two products bearing the same trademark is material is whether the

difference 'confuses consumers and impinges on the . . . trademark holder's

goodwill.'"  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d

1067, 1073 (10th Cir. 2009) (citation omitted) (noting that "a difference is material

if 'consumers [would] consider [it] relevant to a decision about whether to

---

[3]There is another exception to the "first sale" defense: when the notice that the item has been repackaged is inadequate.  *See Brilliance Audio*, 474 F.3d at 369-70 (citing *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085-86 (9th Cir. 1998)); *see also Ford Motor Co.*, 911 F. Supp.2d at 624.  Defendant does not argue that this exception is applicable in this case.

16

purchase a product.'").  The Sixth Circuit has not addressed the issue of which

party bears the burden of proof on the first sale doctrine in a civil case.  However,

at least two district courts in the Sixth Circuit and a majority of other district

courts have held the defendant in a civil case bears the burden of proving the

product at issue was lawfully purchased before it may invoke the first sale defense.

*See Perry v. Herd*, 2006 WL 335522, at *13 (E.D. Tenn. Feb. 14, 2006)

(collecting cases).

Plaintiffs first argue that defendant's first sale defense fails because he

cannot prove an authorized first sale of the goods at issue.  *See Liz Claiborne, Inc.*

*v. Mademoiselle Knitwear, Inc.*, 979 F. Supp. 224, 230 (S.D.N.Y. 1997) ("The

question of whether a good is genuine, however, presupposes the initial sale was

authorized.").  As explained in *Ryan v. Volpone Stamp. Co.*, 107 F. Supp.2d 369

(S.D.N.Y. 2000), "a court faced with an infringement claim for unauthorized sales

of a trademarked product must perform a two-part analysis.  First, the court must

consider whether the trademark owner authorized the first sale of the goods.

Second, the court must consider whether the goods were genuine." *Id.* at 382.  "A

trademark signifies that goods sold under it are of equal quality.  A trademark

holder is able to control the quality of the goods and a trademark acts as an

indicator of consistent quality." *FURminator, Inc. v. Kirk Weaver Enters., Inc.*,

545 F. Supp.2d 685, 689 (N.D. Ohio 2008) (citing J. THOMAS MCCARTHY,

17

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 3:10 (4th ed. 1992)).
Importantly, "'the actual quality of the goods is irrelevant; it is the control of
quality that a trademark holder is entitled to maintain.'" *Id.* (citing *El Greco*
*Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986)).
"Goods are not genuine goods until their sale is authorized by the trademark
owner." *Id.* (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 24, cmt. c
(1995)).

Defendant claims that he obtained the goods through a one-time purchase of
two auctioned storage units in May 2013, and thus the first sale defense applies.
Plaintiffs dispute defendant's assertion that the goods at issue were "found" in
storage units purchased at auction, and present strong evidence to support their
position, including testimony by the prior owner of the storage lockers that he did
not have such products in the lockers, pictures of the lockers that did not show any
indication that such a large amount of goods were concealed, and an Amazon sales
report revealing that at least nine items had not been manufactured and imported
into the U.S. before the prior owner was locked out of these storage units in March
2013.  (Dkt. 24, Pg ID 237-39, citing Ex. 1, Harthun Decl. ¶¶ 7-18; Ex. 10,
Hamway Tr. at 10-11, 13-15, 18-22, 24-26, 37; Ex. 11, Dep. Ex. 2; Ex. 12, Dep.
Ex. 5; Ex. 13, Box photos; Ex. 15, Amazon Hub 3000/6000 Record).  Plaintiffs
further argue that regardless of the veracity of defendant's claim as to the source

18

of the goods, defendant's "story" of "found" goods is insufficient as a matter of law to prove an authorized sale by the trademark owner because "[m]ysterious found goods of an unknown origin and unknown nature does not prove a first sale enabling [d]efendant to sell product as new[.]" (Dkt. 27, Pg ID 499).  Plaintiffs contend that defendant's storage locker contention signifies, at best, a lack of knowledge as to the initial source of the goods.

In *Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, the defendants purchased some goods through eBay and were "unsure where the parts came from or where they were produced before they arrived in their possession."  911 F. Supp.2d at 620.  The Court concluded that "Defendants' repackaging of goods they can only 'speculate' are produced by Ford and purchased within Ford's supply chain poses a 'risk of injury to the reputation of [Ford's] mark.'" *Id.* at 626-27 (citing *Green v. Elec. Vacuum Cleaner Co.*, 132 F.2d 312, 313 (6th Cir. 1942)).  And, as the Sixth Circuit stated in *Green*, the first sale defense cannot be met by asserting "that the articles are legitimate and, without disclosing their source, were purchased from those who bought from the plaintiff."  *Green*, 132 F.2d at 313; *see also FURminator, Inc.*, 545 F. Supp.2d at 690 ("Courts in the Sixth Circuit are in agreement with the Second Circuit" that "[i]f the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.'") (citing *Ryan*, 107 F. Supp.2d at 382).  Here, even

assuming as true, for purposes of this motion only, that defendant did find the plaintiffs' products in the storage units he acquired, defendant at best can only *speculate* as to the origin of such products, and certainly offers no rebuttal to plaintiffs' proof that the products were returned product not to be resold. Plaintiffs offered evidence that the Peak 6000 product they purchased from defendant was falsely sold as new, and that the inspection of the remaining inventory showed evidence of wear, resealing tape, markings, stickers, and a variation of goods, including a limited edition product, that established that these products were returns not authorized for sale. (Dkt. 24, Ex. 1, Harthun Decl. ¶¶ 14, 16, 19-21, 28; Ex. 16, Amazon Customer Records; Dkt, 8, ¶ 36). This evidence is unrefuted by defendant. Accordingly, defendant has not established that the first sales of the products at issue were "authorized" and plaintiffs are entitled to summary judgment on their trademark infringement claim.

Moreover, even if the first sale was authorized, the undersigned concludes that the first sale defense is still inapplicable here because plaintiffs have presented undisputed evidence that the products defendant offered for sale were "materially different" than the products sold by plaintiffs. Specifically, defendant sold products with inaccurate information–representing products as "new" when they were not new–and defendant impeded plaintiffs' product quality/warranty and quality control mechanisms, as plaintiffs do not sell returned or refurbished or

20

reconditioned goods.  Plaintiffs presented evidence that numerous items defendant sold using plaintiffs' trademarks were sold as new items, even though defendant does not dispute that he could not know that the items were new.  (Dkt. 24, Ex. 1, Harthun Decl. ¶¶ 14, 16, 19-21, 28; Ex. 16, Amazon Customer Records; Dkt, 8, ¶ 36).  Plaintiffs presented evidence that many of the items defendant sold were instead returned items, and defendant admitted that he opened items "to make sure they functioned properly" and then "immediately resealed" them.  (Dkt. 26, p 4).  As plaintiffs established, once defendant broke the seal and operated the products, the goods sold were not "unused, unopened item" with "[o]riginal protective wrapping" intact and with any original warranty still fully applicable, as explained to Amazon customers for "new" items.  (Dkt. 24, Ex 17).  Further, many of the goods showed signs of non-factory resealing.  (Dkt. 24, Ex. 1, Harthun Decl. ¶¶ 22, 26).  Thus, it is undisputed that the products were not "genuine" because they were sold as new rather than used.[4]  Further, plaintiffs presented evidence that the distribution of returned goods is contrary to the quality control process established by plaintiffs, which does not include selling or refurbishing returned

---

[4]Defendant's argument that the products could be "deemed new" because customers were not complaining and demanding refunds fails as a matter of law.  That customers did not complain simply does not transform the products into "new" products.  Further, defendant also sold some items as "refurbished" or as purported "show case models."   However, the undersigned agrees with plaintiffs that such representations are precluded by defendant's claim that he purchased the items at the storage locker auction, because, assuming that story is true, defendant could not know that any items were "refurbished" or "show case models," as he represented on Amazon.

product.  (Dkt. 24, Ex. 1, Harthun Decl. ¶¶ 22-23).  Plaintiffs never authorized those products to be re-sold to the public.  (*Id.* ¶ 24).  As plaintiffs correctly argue, reselling products with inferior warranties constitutes a material difference negating the first sale defense.  *See Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1073 (10th Cir. 2009) (concluding that material differences may include the warranties and services associated with the products at issue); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992) (collecting cases showing that "the threshold of materiality is always quite low").

Plaintiffs have therefore established that defendant committed trademark infringement by selling goods on Amazon using plaintiffs' trademarks when he had no evidence of an authorized sale of those goods, and the first sale defense is vitiated when the products were sold with inaccurate information and/or material differences.   The undersigned concludes that the material differences eliminate the first sale defense as a matter of law, and plaintiffs are entitled to summary judgment on their trademark infringement claim.

### D.    Unfair Competition

Plaintiffs argue that they are entitled to summary judgment on their unfair competition claims for the same reasons they are entitled to summary judgment on their trademark infringement claim, citing *Champions Golf Club, Inc. v. The*

22

*Champions Golf Club, Inc.*, 78 F.3d 1111, 1122-23 (6th Cir. 1996).  Defendant failed to respond to this issue.  To prevail on their claim for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), plaintiffs must establish, as they did for their trademark infringement claim, that defendant's use of plaintiffs' trademark creates a likelihood of confusion.  *See General Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 354 (6th Cir. 2006) (holding resolution of an unfair competition claim also rests on likelihood of confusion inquiry); *see also Express Welding, Inc. v. Superior Trailers, LLC*, 700 F. Supp.2d 789, 797 (E.D. Mich. 2010) ("To obtain summary judgment on its trademark infringement and unfair competition claim, the plaintiff must establish as a matter of law that the defendants' use of its marks creates a likelihood of confusion regarding the origin of the goods or services offered by the defendants.").  For the same reasons stated above as to plaintiffs' trademark infringement claim, the undersigned concludes that plaintiffs are entitled to summary judgment on their unfair competition claim.

### E.    False Advertising

Plaintiffs assert a claim for false advertising pursuant to 15 U.S.C. § 1125(a).  To prove a claim for false advertising under the Lanham Act, a plaintiff must establish that: (1) the defendant has made false or misleading statements of fact concerning his product or another's; (2) the statement actually

23

or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff. *See Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 323 (6th Cir. 2001) (citation omitted). "Where statements are literally false, a violation may be established without evidence that the statements actually misled consumers" and "actual deception is presumed." *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999).

Plaintiffs argue that defendant's selling of used and formerly returned products as "new" constitutes false advertising, and presented evidence that they purchased a Peak 6000 that was sold as "new" but which had been returned and was used, and that defendant stated that he opened everything that he sold, which would render the products not "new." (Dkt. 24, Ex. 7, Court Tr. at 18). Defendant further misrepresented a product as "refurbished" and admitted to misrepresenting the number of units available for sale. And, plaintiffs presented evidence that defendant disseminated these statements through its internet advertising, and therefore demonstrated that the statements entered interstate commerce, and that defendant's actions detract from the value of plaintiffs' mark. Defendant offered

24

no response to plaintiffs' argument that this conduct established liability for false advertising.   Therefore, because defendant has not adduced sufficient evidence to create a genuine fact issue, plaintiffs should be granted summary judgment as to their claim of false advertising under 15 U.S.C. § 1125(a).

### F.   Damages/Disgorgement of Profits

Plaintiffs assert that a prevailing plaintiff in a trademark infringement case may, under certain circumstances, recover a defendant's profits subject to the principles of equity.   15 U.S.C. § 1117(a); *LaQuinta Corp. v. Heartland Props., LLC*, 603 F.3d 327, 342 (6th Cir. 2010) ("[T]he Lanham Act . . . expressly confers upon district judges wide discretion in determining a just amount of recovery for trademark infringement.").   Plaintiffs further assert that an award of disgorgement of profits may be awarded under various rationales, such as unjust enrichment, deterrence, and compensation.   *See Laukus v. Rio Brands, Inc.*, 391 Fed. Appx. 416, 424 (6th Cir. 2010) (noting that a "showing of willfulness is not required," but that "willfulness is one element that courts may consider in weighing the equities").

Plaintiffs contend that they have established the serious problems caused by defendant's extremely low pricing below wholesale pricing, defendant's misrepresentations of the products as new, and the resulting damage to plaintiffs' business relationships.   According to plaintiffs, sale of products slated for

destruction immeasurably damages the reputation of plaintiffs' products and plaintiffs' goodwill. Plaintiffs continue that this also causes significant confusion in the marketplace as to the approval of the products, as backed by plaintiffs' goodwill and quality assurance. Plaintiffs argue that defendant has been brazen in selling the returned product on the largest Internet retailer at sharply lower prices without any evidence supporting a first sale defense. Plaintiffs state that it is undisputed that the total sales provided by defendant in the Amazon Seller report is $24,330.63, with a total payment to defendant after Amazon seller fees of $20,849.29, between August 1, 2013 and December 31, 2013. (Dkt. 24, Ex. 18, Amazon Seller Report). Defendant also provided an excel file exported from his Amazon account that itemizes the sales made during that time frame, in which it appears that sales involving non-Homedics branded products amounted to only about $500. Plaintiffs submit that, pursuant to § 1117(a), they are entitled "to recover . . . defendant's profits" and need "prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Plaintiffs argue an award of $20,000 is appropriate.

Defendant did not address, much less refute, plaintiffs' claim for damages. Accordingly, there being no genuine issue of material fact as to this issue, plaintiffs' motion for summary judgment as to damages should be granted and plaintiffs should be awarded damages in the amount of $20,000, representing

26

disgorgement of profits.

## IV.   RECOMMENDATION

For the reasons set forth above, plaintiffs' motion for summary judgment should be **GRANTED** and plaintiffs should be awarded damages in the amount of **$20,000.00**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc.  If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date: December 23, 2014              s/Michael Hluchaniuk
                                     Michael Hluchaniuk
                                     United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on December 23, 2014, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following:Linda D. Mettes, Mark A. Cantor, Ronald L. Cornell, Jr. and that I have mailed by United States Postal Service to the following non-ECF participant: John Joseph Beauvais, 2900 East Jefferson, Apt. D-400, Detroit, MI 48207.

                                     s/Tammy Hallwood
                                     Case Manager
                                     (810) 341-7887
                                     tammy_hallwood@mied.uscourts.gov